IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

TERESA LOCKETT and
TARA HAMPTON                                                    PLAINTIFFS

v.                              NO. _____

DOLLAR GENERAL CORPORATION;
JONATHAN HOLLOWAY; MYERS
RAYBORN; and PAUL GRIMES                                   DEFENDANTS

**COMPLAINT**

COMES NOW Plaintiffs, by and through counsel, Wallace, Martin, Duke & Russell, PLLC, and for Plaintiffs' Complaint, Plaintiffs state:

**PARTIES AND JURISDICTION**

1.      Plaintiff Teresa Lockett ("Lockett") is a resident and citizen of Marshall County, Mississippi.  Plaintiff Tara Hampton ("Hampton") is a resident and citizen of Marshall County, Mississippi.  Defendant Dollar General Corporation (hereafter "DG") is a domestic corporation with regard to the State of Tennessee that is authorized to do business in the State of Mississippi.  Upon information and belief, Defendants Jonathan Holloway ("Holloway"), Myers Rayborn ("Rayborn"), and Paul Grimes ("Grimes") are all residents and citizens of the State of Mississippi.  This is an action brought under the Civil Rights Act of 1964 for sex discrimination, for retaliation based upon violations of the Civil Rights Act of 1964 by Defendants against Plaintiffs, opposition to an illegal activity and retaliation for such opposition, conspiracy under 42 U.S.C. § 1985, and for promissory estoppel.  Plaintiffs timely filed Charges of Discrimination with the Equal Employment Opportunity Commission (hereafter "EEOC") and now bring this present case based upon receipt of Right to Sue Letters from the EEOC.  Accordingly, this Court has federal question subject

matter jurisdiction under 28 U.S.C. 1331.  Since the acts giving rise to this present cause of action all occurred within the jurisdiction of this Court, venue is proper under 28 U.S.C. 1391(b).  Further, this Court has supplemental jurisdiction over Mississippi State Law claims under 28 U.S.C. 1367.

## GENERAL ALLEGATIONS OF FACT

2.     Hampton began working for Defendants on or about March 1, 2012.

3.     Lockett began working for Defendants on or about June 1, 2012.

4.     At all times during Plaintiffs' employment with Defendants, Plaintiffs performed their jobs satisfactorily.

5.     Neither Hampton nor Lockett ever resigned from DG.

6.     During Plaintiffs' tenure with Defendants, Plaintiffs worked for Defendants at Dollar General Store #11064 located at 133 Taska Road, Red Banks, Mississippi 38661.

7.     Hampton worked as a Lead Sales Associate for Defendants.

8.     Lockett worked as a Cashier for Defendants.

9.     Holloway worked as the Store Manager for DG at the same store as Hampton and Lockett until Holloway was terminated.

10.    Rayborn worked as the Store Manager for DG at the same store as Hampton and Lockett after Holloway's termination.

11.    Grimes worked as the District Manager over the DG District that includes the store in which Hampton and Lockett worked during the time in which Holloway was manager as well as the time when Rayborn was manager.

12.    Prior to Holloway's termination, Holloway made repeated sexual advances toward female employees whom he supervised at DG.

13.    From March until July 2012, Holloway made specific sexual advances toward a cashier at DG named Keoshal Hankins ("Hankins").

2

14.     These advances included specific requests to perform sex acts upon Hankins, sending Hankins graphic pictures of Holloway's genitals, discussions about his favorite sex acts to perform on women, touching Hankins body against Hankins' will and without permission, and providing Hankins with a sex tape of Holloway's sexual abilities.

15.     All sexual advances by Holloway toward Hankins were rebuffed by Hankins.

16.     Hankins specifically asked Holloway to stop making these sexual advances yet Holloway continued to make sexual advances toward Hankins.

17.     Hankins complained about Holloway's behavior to Hampton who was Hankins' supervisor.

18.     Hampton also personally witnessed some of Holloway's behavior toward Hankins.

19.     Hampton properly notified DG Human Resources about the sexual harassment complaint against Holloway made to Hampton by Hankins as well as the harassment of Hankins by Holloway that Hampton witnessed herself.

20.     Because the store manager, Holloway, was the sexual harasser in this complaint, the complaint was escalated to Holloway's supervisor, Grimes.

21.     On or about June 30, 2012, Holloway became aware that Hankins had filed a sexual harassment complaint against him.

22.     Not knowing that Hampton had also filed such a complaint, Holloway asked Hampton to assist him with finding enough evidence to terminate Hankins so that Hankins' story would never be believed by Grimes.

23.     Holloway began adding additional duties to Hankins' responsibilities including cleaning bathrooms and other menial tasks in an attempt to get Hankins to resign.

24.     Grimes met with Hankins on three (3) different occasions about the complaints Hankins made about Holloway.

25.     Grimes never interviewed Hampton about the complaints Hampton made about Holloway with regard to Hankins.

26.     On October 5, 2012, Hampton was contacted by someone identifying himself as working for DG who asked Hampton about her complaints against Holloway.

27.     Hankins eventually stopped working for Defendants.

28.     Holloway made unwanted sexual advances toward Lockett beginning immediately after Lockett began working for Defendants in June 2012.

29.     These advances included specifically referring to sexual acts he wished to perform upon Lockett, suggesting that he could not separate his sexual feelings for Lockett from the employment relationship he had with her at DG, repeatedly asking Lockett to come to his house to perform sex acts, and making references to Lockett's body parts that Holloway found most attractive.

30.     All such advances by Holloway took place while both Holloway and Lockett were working at DG during regular work hours.

31.     Lockett repeatedly told Holloway that she was not interested in pursuing any sort of sexual relationship with him and asked Holloway to stop making such sexual advances toward her.

32.     Holloway persisted in his comments and demands that Lockett provide him with sexual gratification.

33.     Holloway compared himself to male customers who had Lockett as a cashier for their purchases suggesting that Lockett was being too nice to them because she might give these male customers sex but she was refusing to provide it to her boss – Holloway.

34.     Lockett reported the actions of Holloway to her supervisor, Hampton.

35.     Hampton properly notified DG Human Resources about the sexual harassment complaint made by Lockett against Holloway.

36.     Because the store manager, Holloway, was the sexual harasser in this complaint, the complaint was again escalated to Holloway's supervisor, Grimes.

37.     Grimes never interviewed Lockett about the complaints Lockett made about Holloway.

38.     Grimes never interviewed Hampton about the complaints Hampton made about Holloway with regard to Lockett.

39.     Holloway was terminated from DG.

40.     Rayborn took over Holloway's duties as Store Manager at the store in which Lockett and Hampton worked.

41.     Prior to Rayborn becoming manager, Lockett was typically scheduled to work five (5) days a week at the store for approximately 25 to 30 hours per week.

42.     After Rayborn became manager, Rayborn began cutting Lockett's hours.

43.     Rayborn initially cut Lockett's hours by sending her home when she would arrive for work on days she had been scheduled to work.

44.     Rayborn then began cutting the days Lockett was scheduled to work in half, and then reduced it to only one (1) to two (2) days per week.

45.     Rayborn told other employees at the store that he was doing this on purpose in hopes of making Lockett resign or to set up an excuse to terminate Lockett's employment with Defendants.

46.     Rayborn also cut Hampton's weekly hours from 40 hours per week to only 28 hours per week.

47.     Rayborn never cut the hours of male employees to the extent that he cut those of the Plaintiffs.

48.     Employees who had never complained of sexual discrimination at DG did not have their hours cut by Rayborn.

49.     Grimes was aware of and ratified the cutting of Plaintiff's hours by Rayborn.

50.     Throughout the rest of the time that Plaintiffs worked for DG, Rayborn would routinely assign each of them menial, custodial tasks that were not part of their job responsibilities while never assigning such tasks to males or to employees who had never complained of sexual discrimination at DG.

51.     Futher, Rayborn assigned tasks to Plaintiffs individually that would normally have been performed by more than one employee at DG.

52.     Such tasks included Hampton being ordered by Rayborn to clean up an entire melted shipment of ice cream and manually account for each melted container.

53.     As Store Manager, Rayborn was required to take part in such an accounting of ruined merchandise yet he refused to participate in any way leaving all responsibility for this task to Hampton.

54.     Rayborn never forced any of his male employees to engage in such menial tasks.

55.     Rayborn never forced any employees who have never complained of sexual discrimination at DG to engage in such menial tasks.

56.     Rayborn created false written warnings concerning Hampton.

57.     On October 13, 2014, Rayborn claimed that Hampton was a no call no show for an evening shift at the store even though Hampton had never been notified of being schedule for any such shift and had in fact not been scheduled for that shift.

58.     Rayborn texted Hampton after the supposed shift began demanding that she work even though she was not scheduled to do so.

59.     Rayborn issued a written warning to Hampton on October 14, 2014, for this false accusation of no call no show which Hampton refused to sign.

60.     On this same day, October 14, 2014, Rayborn issued Hampton a second written warning claiming that Hampton's cash drawer had been over by $2 on her last shift worked on October 12, 2014.

61.     Rayborn refused to provide any proof of this supposed infraction to Hampton and Hampton refused to sign this false written warning.

62.     On October 18, 2012, Hampton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

63.     On October 21, 2012, Rayborn fired Lockett from employment with Defendants.

64.     No reason was given to Lockett for the termination by Rayborn.

65.     Lockett's termination was in retaliation for Lockett making complaints of sexual discrimination by Defendants.

66.     Grimes ratified Rayborn's termination of Lockett.

67.     At no time did Grimes discipline Rayborn for his actions with regard to Lockett's termination.

68.     Both Rayborn and Grimes were specifically aware of the ongoing internal investigation regarding sexual harassment that was initiated by Lockett.

69.     Both Rayborn and Grimes were specifically aware of the ongoing EEOC investigation initiated by Lockett regarding sexual harassment at DG.

70.     On October 29, 2012, Lockett filed a Charge of Discrimination with the EEOC.

71.     Beginning in November 2012 and continuing through June 2013, Rayborn continued to harass and intimidate Hampton by threatening to give her additional written

warnings for non-existent violations of policy, reducing her hours at the store to fewer hours than she had been schedule to work prior to complaining of sexual discrimination, and making false accusations about Lockett's work ethic and discipline at the store.

72.     On June 12, 2013, Rayborn fired Hampton from working for Defendants.

73.     Rayborn cited false written warnings and other untruthful reasons as justification for the termination.

74.     Hampton's termination was in retaliation for Lockett making complaints of sexual discrimination by Defendants.

75.     Grimes ratified Rayborn's termination of Hampton.

76.     At no time did Grimes discipline Rayborn for his actions with regard to Hampton's termination.

77.     Both Rayborn and Grimes were specifically aware of the ongoing internal investigation regarding sexual harassment that was initiated by Hampton.

78.     Both Rayborn and Grimes were specifically aware of the ongoing EEOC investigation initiated by Hampton regarding sexual harassment at DG.

79.     Retaliating against an employee for complaining about sexual discrimination is a violation of DG's Employee Handbook.

80.     With full knowledge of Rayborn's actions, Grimes took no steps to correct this violation of DG's Employee Handbook by Rayborn or to address the discriminatory and retaliatory actions of Rayborn.

81.     Grimes' ratification of the terminations of the Plaintiffs by Rayborn is a blatant violation of DG's Employee Handbook.

82.     Upon information and belief, other similarly situated male employees of Defendants who have committed more serious infractions than those Defendants accused Plaintiffs of committing have been allowed to continue their employment with Defendants.

83.     Upon information and belief, other similarly situated employees of Defendant who have not complained about sex discrimination at DG have been allowed to continue their employment with Defendants.

84.     Plaintiffs timely filed Charges of Discrimination with the EEOC.

85.     Plaintiffs now timely bring this cause of action within 90 days after receipt of Plaintiffs' Right to Sue Letters from the EEOC.

## COUNT I – DISCRIMINATION AND RETALIATION

86.     Plaintiffs re-allege the foregoing as if fully set out herein.

87.     Plaintiffs have a clearly established right to be free from race discrimination under the Constitution of the United States.

88.     Plaintiffs bring this action under 42 U.S.C. 1981 because of the deprivation of Plaintiffs' constitutional rights by Defendants as granted under the Equal Protection Clause and the Due Process Clause.

89.     Defendants have retaliated against Plaintiffs for Plaintiffs' complaints concerning sex discrimination.

90.     As a direct and proximate cause of Defendants' actions as alleged herein, Plaintiffs have lost wages, lost fringe benefits, and suffered both severe mental and emotional distress in an amount to be proven at trial.

91.     Defendants' actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT II – OPPOSITION TO AN ILLEGAL ACTIVITY
## AND RETALIATION FOR SUCH OPPOSITION

92.     Plaintiffs re-allege the foregoing as if fully set out herein.

93.     Under Mississippi State Law, an employee who reports an illegal action of his employer to his employer and is then discharged falls within a narrow public policy

exception to the general at will employment doctrine. *See McArn v. Allied Bruce-Terminix Co., Inc.* 626 So. 2d 603 (1993).

94.     Plaintiffs repeatedly reported to DG that illegal actions were taking place at DG.

95.     These reports of illegal activity were temporal to the termination of Plaintiffs by DG.

96.     As a direct and proximate cause of DG's actions as alleged herein, Plaintiffs have lost wages, lost fringe benefits, and suffered both severe mental and emotional distress in an amount to be proven at trial.

97.     DG's actions have been so egregious so as to warrant the imposition of punitive damages.

### <u>COUNT III – CONSPIRACY UNDER 42 U.S.C. § 1985</u>

98.     Plaintiffs re-allege the foregoing as if fully set out herein.

99.     Plaintiffs have a right to enjoy the rights and privileges of a United States citizen, including the right to be free from sexual discrimination in employment.

100.     Defendants Holloway, Rayborn, and Grimes conspired to terminate Plaintiffs' employment because of their race as well as their complaints of sexual discrimination at the hands of Holloway and Rayborn.

101.     Defendants Holloway, Rayborn, and Grimes acted in furtherance of this conspiracy by taking the following actions:   retailing against Plaintiffs for making complaints of sexual discrimination, refusing to properly investigation complaints of sexual discrimination, openly participating in acts of sexual discrimination after being informed of complaints of such discrimination, terminating Plaintiffs for false reasons, manufacturing disciplinary actions to cover up discrimination, and repeatedly changing the job duties of the Plaintiffs.

102.    Defendants Holloway, Rayborn, and Grimes acted in their own self interests and contrary to the interests of DG when engaging in this conspiratorial activity.

103.    As a direct and proximate cause of the actions and omissions of Defendants Holloway, Rayborn, and Grimes, Plaintiffs have suffered severe mental and emotional distress, lost wages, lost fringe benefits, lost earning capacity, and has incurred medical expenses which would not otherwise have been incurred.

104.    The acts of Holloway, Rayborn, and Grimes have been in willful, intentional, and malicious violation of the law and are so egregious so as to warrant the imposition of punitive damages.

## COUNT IV – PROMISSORY ESTOPPEL

105.    Plaintiffs re-allege the foregoing as if fully set out herein.

106.    Defendants provided Plaintiffs with a handbook that included internal processes by which employees were guaranteed protection against sexual discrimination and retaliation along with processes by which complaints about such treatment would be properly investigated and actions taken against anyone found to be committing racial discrimination or retaliation.

107.    Defendants posted information regarding Plaintiffs' right to be free from sexual discrimination and retaliation in a conspicuous place where all employees could see such a posting.

108.    Plaintiffs experienced sexual discrimination at the hands of Defendants and properly reported such discrimination yet Defendants did not abide by Defendants' own policies providing for such reporting and promising not to retaliate against reporters of sexual discrimination as posted by Defendants at Plaintiffs' worksite.

109.    Plaintiffs regarded the ability to report sexual discrimination and not face retaliation for making such a report as outlined in Defendants' handbook and posted by

Defendants as a promise to abide by federal law and Defendants' own internal policies regarding such reporting.

110.    Plaintiffs reasonably regarded the policies as outlined in Defendants' handbook as a promise to abide by federal law and Defendants' own internal policies regarding sex discrimination and retaliation.

111.    Defendants intended for Plaintiffs to regard Defendants' handbook as a promise that Defendants would abide by the policies regarding the reporting of sexual discrimination free from retaliation while working for Defendants as outlined in Defendants' handbook.

112.    Plaintiffs did, in fact, reasonably rely upon Defendants' promise to abide by its own policies as outlined in Defendants' handbook.

113.    Defendants failed to abide by Defendants' own policies as outlined in Defendants' handbook regarding the reporting of sexual discrimination free from retaliation.

114.    Due to Plaintiffs' reliance on Defendants' promise to abide by the sexual discrimination and retaliation policies as outlined in Defendants' handbook, Plaintiffs have experienced an injustice in the form of their terminations and have been damaged.

115.    As a direct and proximate cause of Defendants' acts and omissions alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost earning capacity, and incurred other damages in an amount to be proven at trial.

116.    Defendants' actions have been willful, such that the Plaintiffs are entitled to an award of liquidated and punitive damages.

WHEREFORE, Plaintiffs pray for appropriate compensatory damages exceeding $75,000, for reasonable attorneys' fees, for costs, for a trial by jury, and for all other proper relief.

Respectfully submitted,


WALLACE, MARTIN, DUKE & RUSSELL, P.L.L.C.
Attorneys at Law
1st Floor, Centre Place
212 Center Street
Little Rock, Arkansas 72201
Attorney for Plaintiff


By: _____ */s/ James M. Scurlock* _____
      James M. Scurlock, Tenn. BPR 031292
      jms@WallaceLawFirm.com